IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
May 10, 2016 Session

**STATE OF TENNESSEE v. MITCHELL BLAKE PUCKETT**

**Direct Appeal from the Circuit Court for Cheatham County
No. 17162    Larry Wallace, Judge**

---

**No. M2015-01938-CCA-R3-CD – Filed March 27, 2017**

---

A Cheatham County Circuit Court Jury convicted the Appellant, Mitchell Blake Puckett, of attempted first degree premeditated murder, a Class A felony, for which he received a sixteen-year sentence.  On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction.  He concedes that the evidence established he committed attempted second degree murder but maintains that the State failed to adduce proof of premeditation to sustain a conviction of first degree murder.  Upon review, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and TIMOTHY L. EASTER, JJ., joined.

James L. Baum, Burns, Tennessee (on appeal), and David W. Wyatt, Ashland City, Tennessee (at trial), for the Appellant, Mitchell Blake Puckett.

Herbert H. Slatery III, Attorney General and Reporter; David H. Findley, Senior Counsel; Dan M. Alsobrooks, District Attorney General; and Robert S. Wilson, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**I.  Factual Background**

At trial, the victim, James Jameson, testified that around 5:30 or 6:00 p.m. on December 17, 2013, he put a .22 caliber rifle in the backseat of his Chevrolet Tahoe, loaded his dog in the vehicle, and left his house to go hunting.  As he was driving on Valley View Road toward Waynoe Road, he saw two young men, one of whom was the

Appellant, walking in the middle of the road next to the double yellow line. The men lived in the victim's neighborhood.

The victim drove up behind them, but they would not move. He "pulled around," rolled his window halfway down, and asked them to get out of the road. The Appellant threw his arm up and said, "[Y]ou're f[***]ing with the wrong guy." The Appellant stepped back, pulled a black pistol out of his pants, and pointed the gun at the victim. The victim, fearing he would be shot, drove away. The victim recalled that when he pressed the accelerator, he heard two gunshots. A bullet struck the glass on the rear passenger door, and the glass fell out. The victim stopped on the side of the road and checked his vehicle. He saw a bullet lodged in the door jamb between the front passenger seat and the rear passenger seat. The victim said that his rifle was not close enough for him to reach it and return fire.

The victim drove until he was certain he was out of range of the Appellant's gun. He parked on the side of the road, called his wife, then called 911. When the police arrived, the victim told the officers about the shooting.

On cross-examination, the victim said that after the Appellant pulled out the pistol, the Appellant stood in place for thirty seconds or one minute while pointing the gun at the victim's head. The victim drove away just before the Appellant began shooting. The two shots were fired in quick succession. The victim did not look back as he drove away.

Cheatham County Sheriff's Deputy Walter Bamman testified that he and Detective Jeffrey Landis were dispatched to the scene. The victim told Deputy Bamman that he saw two young men walking down the road, yelled at them to get out of the road, and they responded, "[Y]ou are f[***]ing with the wrong one." After the shooting, the victim drove away and called 911. Deputy Bamman examined the victim's vehicle and saw that a window had been shot out and that a "flattened" round had fallen onto the running board after it hit the door jamb. The victim showed the deputy where the Appellant was standing when the shots were fired. Deputy Bamman found an unfired round and two shell casings on the road in that area.

On cross-examination, Deputy Bamman said that the shell casings were lying close together on the road. He explained that if a semi-automatic pistol jammed, a person needed to "rack it backwards" to eject the round.

Lieutenant Shannon Heflin testified that he was the head of the crime scene investigation division. On December 17, Lieutenant Heflin and Detective Landis went to the home of the other suspect, Dylan Legon, to try to find the Appellant. They talked with Legon's mother and brothers and were told that the Appellant was not at the residence and that he might be "up the road." The officers left the residence then got a

call that the Appellant was at Legon's residence. The officers returned to the residence and found the Appellant in a bedroom, hiding in an old bathtub or hot tub that was covered by a mattress. The officers took the Appellant into custody, put him in the back of a patrol car, and advised him of his <u>Miranda</u> rights. Inside the residence, Lieutenant Heflin found a backpack containing some clothes and a handgun.

Detective Jeffrey Landis, Sr., testified that on the day of the offense, he went to the scene and examined the victim's vehicle. He found one flattened shell on "the B post" and another flattened shell in the back window on the passenger's side.

After leaving the scene, Detective Landis went to Legon's residence to search for the Appellant. In a bathroom area was a "wooden frame rail" for supporting a sunken tub. A piece of plywood had been placed on the wooden frame rail, and a mattress was on top of the plywood. Detective Landis found the Appellant under the plywood. Detective Landis took the Appellant into custody, handcuffed him, and searched him.

Detective Landis said that the backpack containing the handgun was found beside a couch in the living room of Legon's residence. The backpack also contained a box of ammunition that was partially full, a toothbrush, and a pair of digital scales. The handgun, a Taurus 9 millimeter semi-automatic, was fully loaded and had one bullet in the firing chamber. The bullets appeared to be "hollow points." Detective Landis said that the ammunition was used generally for "personal protection," not for hunting. The Appellant acknowledged that the handgun was his and that he had bought it three days before the shooting.

Later the same day, the Appellant was transported to the criminal investigation division of the sheriff's office, and Detective Landis interviewed him. The interview was audio and video recorded. The recording was played for the jury.

The recording reflects that at the beginning of the interview, Detective Landis informed the Appellant that he needed to perform a gunshot residue test on the Appellant. As Detective Landis was preparing for the test, the Appellant said that he had never done anything "like this," that it "wasn't planned out," that it "just happened," and that he had "snapped." During the test, the Appellant stated that he probably did not have any gunshot residue on his hands because he washed his hands in the creek approximately twenty minutes after the shooting. The Appellant said that he and Legon went from Legon's house to the Appellant's grandmother's house on Seville Road. While there, the Appellant looked at "papers" and "got really pissed" about issues with his ex-girlfriend. The Appellant and Legon left to return to Legon's house. As they walked down the road, a truck stopped beside them, and the Appellant looked in the truck's window. The victim asked, "Why the hell are y'all walking in the road?" The Appellant said that he "got pissed" and "snapped." He initially stated that he did not say anything to the victim then

- 3 -

acknowledged that he "probably" told the victim that he "f[***]ed with the wrong dude today" but did not remember saying it. The Appellant said that he then pulled out his gun and started shooting. The Appellant said that when he pulled the gun out, he stepped back and shot. The victim drove away, and the Appellant shot again. At that point, the Appellant thought, "What the hell am I doing?" Afterward, the Appellant and Legon ran into the woods and got lost because it was dark. Eventually, they found their way back to Legon's house. Legon's mother gave them food, but the Appellant was too nervous to eat much. Thereafter, the police came to Legon's house, and the Appellant hid because he was scared. The Appellant said that he turned eighteen years old on December 8. He had been prescribed medication for bipolar disorder, but the last time he took the medication was when he was "in the mental institution."

Detective Landis testified that during the interview, the Appellant never claimed that he acted in self-defense.

On cross-examination, Detective Landis said that the unfired round he found on the road was the result of a jam, not a misfire. He conceded that "just because a round jams does not mean that th[e] round was or was not to be fired." Although the bullets in the Appellant's gun were hollow point rounds, the bullets in the box of ammunition were "ball type" rounds that were used most commonly in target practice. Detective Landis said that during the interview, the Appellant was scared and nervous but cooperative. The Appellant stated that the shooting was not premeditated but that "he snapped and it happened."

On redirect examination, Detective Landis said that the cartridge casings were found on the road six or eight inches apart and that he did not know whether the Appellant was moving when those rounds were fired. However, the jammed bullet was found fifteen feet away, which indicated the Appellant was moving toward the victim while shooting. Additionally, by the time the Appellant cleared the jammed round, the victim likely was out of firing range. Detective Landis opined that shooting a person while aiming at their head was an indication "that somebody wanted to kill them."

On recross-examination, Detective Landis acknowledged that he did not know definitively whether the Appellant intended to fire a third round.

The Appellant chose not to testify or put on proof. The jury convicted the Appellant of attempted first degree premeditated murder. Thereafter, the parties entered into an agreement whereby the Appellant was sentenced as a Range I, standard offender to sixteen years. On appeal, the Appellant challenges the sufficiency of the evidence sustaining his conviction, conceding that he committed attempted second degree murder but arguing that the State failed to prove that he acted with premeditation.

## II.  Analysis

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings.  See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).  The appellant must establish that no reasonable trier of fact could have found the essential elements of the offense beyond a reasonable doubt.  See Jackson v. Virginia, 443 U.S. 307, 319 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom.  See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983).  In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts.  See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  See State v. Pendergrass, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999).  Even though convictions may be established by different forms of evidence, the standard of review for the sufficiency of that evidence is the same whether the conviction is based upon direct or circumstantial evidence.  See State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011).

First degree murder is the "premeditated and intentional killing of another."  Tenn. Code Ann. § 39-13-202(a)(1).  A criminal attempt occurs when a person acting with the kind of culpability otherwise required for the offense:

> (1) Intentionally engages in action or causes a result that would constitute an offense, if the circumstances surrounding the conduct were as the person believes them to be;
>
> (2) Acts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part; or
>
> (3) Acts with intent to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense.

Tenn. Code Ann. § 39-12-101(a)(1)-(3).

The Appellant concedes that the evidence adduced at trial was sufficient to sustain a conviction of attempted second degree murder. He argues, however, that the State failed to adduce sufficient proof of premeditation to sustain a conviction of attempted first degree murder. The State maintains that the proof supported the jury's finding that the Appellant acted with premeditation.

Premeditation "is an act done after the exercise of reflection and judgment" and "means that the intent to kill must have been formed prior to the act itself. [However,] [i]t is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time." Tenn. Code Ann. § 39-13-202(d). Although there is no concrete test for determining the existence of premeditation, Tennessee courts have relied upon the following circumstances to infer premeditation: (1) the defendant's prior relationship to the victim which might suggest a motive for the killing; (2) the defendant's declarations of intent to kill; (3) the defendant's planning activities before the killing; (4) the manner of the killing, including the defendant's using a deadly weapon upon an unarmed victim, killing the victim while the victim is retreating or attempting escape, or killing the victim in a particularly cruel manner; and (5) the defendant's demeanor before and after the killing, including a calm demeanor immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914-15 (Tenn. 1998); State v. Bland, 958 S.W.2d 651, 660 (Tenn. 1997). Additionally, this court has stated that a lack of provocation by the victim and the defendant's failure to render aid to the victim are factors from which premeditation may be inferred. See State v. Lewis, 36 S.W.3d 88, 96 (Tenn. Crim. App. 2000). "These factors, however, are not exhaustive." State v. Davidson, 121 S.W.3d 600, 615 (Tenn. 2003). "A jury is not limited to any specific evidence when determining whether a defendant intentionally killed [or attempted to kill] the victim after the exercise of reflection and judgment." Id. (internal quotation marks and citation omitted).

The Appellant argues that although premeditation may "be formed in an instant, . . . an instant is not sufficient time to deliberate, i.e. to reflect and exercise judgment nor be free from excitement and passion." In the past, first degree murder was defined as "'[a]n intentional, premeditated and deliberate killing of another. . . .'" State v. Nichols, 24 S.W.3d 297, 301 (Tenn. 2000) (quoting Tenn. Code Ann. § 39-13-202(a)(1) (1991)). Our supreme court has explained that "deliberation and premeditation [we]re similar, but distinct, elements of the offense of first degree murder." Id. The element of premeditation was distinguished "from the element of deliberation by emphasizing that although the element of premeditation is capable of instantaneous formation, deliberation requires some period of reflection, during which the mind is free from the influence of excitement, or passion." Id. at 302 (internal quotation marks, citation, and emphasis omitted). However, in 1995, the first degree murder statute was amended, and deliberation was eliminated as an element of the offense. State v. Dellinger, 79 S.W.3d

458, 490 n.13 (Tenn. 2002). Therefore, we need no longer consider whether the Appellant had sufficient time for deliberation.

In the light most favorable to the State, the proof adduced at trial revealed that the victim was driving down the road and saw the Appellant and Legon walking in the middle of the road. When the young men would not move, the victim drove up beside them, rolled down his window, and told them to get out of the road. The Appellant told him, "[Y]ou're f[***]ing with the wrong guy." The Appellant pulled out a gun and pointed it at the victim for thirty seconds to one minute. The victim drove away, and the Appellant fired two shots at the victim; both bullets hit the passenger side of the victim's vehicle. Afterward, the police found shell casings on the road. Additionally, the police found an unfired bullet that had been cleared from the gun when it jammed, which indicated that the Appellant tried to fire a third bullet at the victim. The position of the bullet indicated that the Appellant walked toward the victim while attempting to fire a third bullet. The victim had a rifle in the car, but it was in the backseat and was never used during the altercation. The Appellant washed his hands after the shooting, secreted the gun in a backpack, and hid from the police in a bathroom. When the police found the Appellant's gun, it was fully loaded, indicating that the Appellant reloaded after the shooting. The only proof adduced regarding potential mental health issues that might have impacted the Appellant's mental state was the Appellant's statement during the interview that he was once prescribed medication for bipolar disorder. We conclude that the evidence of premeditation was sufficient to sustain the Appellant's conviction of attempted first degree murder.

### III. Conclusion

Based upon the foregoing, we affirm the judgment of the trial court.

_____
NORMA MCGEE OGLE, JUDGE